The INDIANA NATIONAL
BANK, Plaintiff,

v.

Robert N. GAMBLE, M.D., and Church
of Christian Liberty, Defendants,

v.

UNITED STATES of America,
Intervenor,

v.

GOLF MILL STATE BANK,
Third-Party Defendant.

No. 83 C 0403.

United States District Court,
N.D. Illinois, E.D.

October 19, 1984.

**1274**

Julie Friedman Alcorn, Alvin D. Meyers, Berman, Fagel, Haber, Maragos & Abrams, Chicago, Ill., for plaintiff.

Michael O'Connell, Asst. U.S. Atty., Chicago, Ill., for intervenor U.S.

Dr. Robert N. Gamble, pro se.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

The plaintiff, Indiana National Bank, originally instituted this action in the Circuit Court of Cook County to set aside as fraudulent the conveyance by defendant Robert N. Gamble of his residence at 9 Beechnut Drive, South Barrington, Illinois to the Church of Christian Liberty. The United States, asserting a tax lien on the property, intervened in that action and had the case removed to this Court pursuant to 28 U.S.C. § 1441. The matter is now before the court on the motions of the United States and Indiana National Bank for summary judgment. For the reasons stated below, both motions are granted.

### Factual Background

For the purposes of the present motion, the facts will be interpreted in the light most favorable to the defendant. However, as the following summary will show, the material facts of this case are not in dispute. Dr. Robert N. Gamble is a cardiac, thoracic, and vascular surgeon, who began religious training with the Church of Christian Liberty in 1972. In 1974, Dr. Gamble became ordained as a minister of the Church and a member of the Order of John Calvin the Reformer. Gamble's relationship with the Church involves several complex financial arrangements. As part of his ordination, Gamble underwent a vow of poverty which required him to transfer all his and his immediate family's assets (except for his personal library) and to assign all his future income to the Church. In exchange, Gamble received assurances of a monthly stipend to cover all the family's bills, such as the mortgage and insurance on the Beechnut property, utility payments and grocery bills. Under this arrangement, Gamble's family remains substantially free to dispose of his income as they see fit.

Gamble's financial system with the Church also involves use of two corporations. In 1976, Gamble entered into an agreement with R.V. Tatooles Associates Service Corporation whereby his salary was assigned directly to the Order on a monthly basis. In September 1983, Gamble formed the John Knox Surgery Corporation, in which Gamble is president, his wife vice-president and secretary, and their daughter treasurer. Gamble is the only physician presently associated with Knox. Under this new arrangement, Gamble re-

ceives no salary. The corporation's funds remaining after expenses are paid are sent to the Order as a fee for Gamble's services, and the Order continues to provide the Gambles with a monthly allowance.

On June 15, 1976, Gamble and his wife executed a trust deed to purchase the Beechnut property. The mortgage on this property was, and still is, held by the third-party defendant, Golf Mill State Bank. According to Gamble, the Order provided the funds for the down payment; title was taken in his and his wife's name, however, because Golf Mill refused to finance any purchases under the Church's name. Although Gamble denies that he ever "owned" the Beechnut property, Gamble admitted having signed the trust deed and the loan application to Golf Mill along with accompanying documents relating to the loan. These documents identify Gamble as one of the co-obligors on the mortgage, and as the record owner of the property.

On July 1, 1977, title to the Beechnut property was conveyed by quit-claim deed from the Gambles to the Church. The stated consideration for the conveyance was $10.00. According to Gamble, this consideration was never paid, but the Gambles did receive an oral assurance that the Church would cover all future mortgage payments, along with payments for matters such as food, utilities, and clothing. Gamble further testified that this conveyance was made voluntarily. Gamble did not notify Golf Mill of the quit-claim transfer since they had previously refused to deal with the Church. The Gambles pay no rent for the use of the house. The mortgage coupons and the insurance are still in his and his wife's names. Gamble has assigned to Mrs. Helen Koerner, his mother-in-law, the task of writing the monthly mortgage checks, which are drawn on her personal checking account. Mrs. Koerner is the only member of Gamble's household who is not subject to his vow of poverty.

At the time that Gamble made the quit-claim transfer, he was in default on three promissory notes issued to plaintiff Indiana National Bank in the amounts of $2,692.57 dated December 12, 1973; $7,304.75 dated December 22, 1972, and $2,798.93 dated June 15, 1973. Consequent to the above default, on or around October 16, 1975, the Bank filed suit against Gamble in Minnesota state court to collect on the notes, plus interest, costs and attorney fees. Due to his religious convictions and the ecclesiastical position of the Order regarding legal counsel, Gamble did not contest the suit, and judgment was rendered against him on September 1, 1977 in the amount of $18,037.80. Gamble has testified that the summons and complaint in that case had been served on him in Minnesota, that he was aware of the lawsuit, and that he was aware of the judgment rendered. The Bank later filed suit against Gamble in Cook County to register its Minnesota judgment in Illinois. Gamble was again aware that he had been made a defendant in that case but again did not appear, and the Bank obtained a registration of the judgment on October 20, 1978.

Also at the time of the quit-claim transfer, Gamble's 1975 income taxes were being audited. The I.R.S. notified Gamble that his 1975 return was being examined by letter dated March 25, 1977. On May 5, Gamble was sent a Report of Individual Tax Audit Changes. Although Gamble's testimony is somewhat conflicting on the matter of receiving these documents, Gamble admitted to mailing a response to the District Director in Edina, Minnesota on May 16, 1977, in which he requested an appointment to discuss the audit.

On May 19, 1978, Gamble filed a petition with the Tax Court for a redetermination of the deficiency in his 1975 income taxes. The Tax Court dismissed Gamble's petition for want of prosecution, and found that there was a deficiency in Gamble's 1975 income tax in the amount of $7,840.66. On July 13, 1981, the Secretary of the Treasury assessed $11,129.71 in unpaid taxes and interest against Gamble. Gamble has refused to pay the assessment, and a Notice of Federal Tax Lien was filed with the Cook County Recorder's office on January 20, 1982. The Government now requests

this court to set aside the conveyance, to reduce its tax assessment against Gamble to judgment, to determine the validity of its lien, and to order that the Beechnut property be sold by a proper officer of the Court with the proceeds to be distributed to the various parties in order of priority.

**Illinois Law of Fraudulent Conveyance**

■■■ The law underlying this case is well-settled. Under Ill.Rev.Stat., ch. 59, § 4, "[e]very gift, grant, conveyance, assignment or transfer of, or charge upon any estate ... made with the intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers, and other persons." The Illinois courts have divided transfers voidable under this section into two categories: fraud in law and fraud in fact. *Tcherepnin v. Franz*, 457 F.Supp. 832, 836 (N.D.Ill.1978); *Harris v. Aimco, Inc.*, 66 Ill.App.3d 60, 62, 22 Ill.Dec. 823, 825, 383 N.E.2d 631, 633 (5th Dist.1978); *Wilkey v. Wax*, 82 Ill.App.2d 67, 70, 225 N.E.2d 813, 814 (1st Dist.1967). To prove fraud in fact, the plaintiff seeking to set aside a transfer must demonstrate an actual intent to hinder creditors. However, a voluntary transfer which is made without consideration or which directly impairs the rights of creditors "will be regarded as fraudulent in law, irrespective of the honesty of the grantor's motives." *First Security Bank v. Bawoll*, 120 Ill.App.3d 787, 76 Ill.Dec. 54, 59, 458 N.E.2d 193, 198 (2d Dist.1983). *See also Capitol Indemnity Corp. v. J.H. Keller*, 717 F.2d 324, 327 (7th Cir.1983) (transfer without consideration constructive fraud and void under Illinois law); *Tcherepnin*, 457 F.Supp. at 836 (fraudulent intent immaterial in fraud in law cases).

■■■ To sustain a claim of fraud in law, a creditor must prove three elements: (1) a voluntary gift; (2) an existing or contemplated indebtedness; and (3) failure of the debtor to retain sufficient assets to pay the indebtedness. *Tcherepnin v. Franz*, 475 F.Supp. 92, 96 (N.D.Ill.1979) (*Tcherepnin II*); *Mills v. Susanka*, 394 Ill. 439, 448, 68 N.E.2d 904, 909 (1946). Because actual intent to impair creditors is irrelevant, the presumption of fraud in such cases can be rebutted only by if the debtor shows that he retained sufficient property to pay his or her obligations, *Tcherepnin*, 457 F.Supp. at 840, or that adequate consideration was given for the transfer. *Harris v. Aimco, Inc.*, 66 Ill.App.3d 60, 62, 22 Ill.Dec. 823, 825, 383 N.E.2d 631, 633 (5th Dist.1978). If the presumption of fraud is successfully rebutted, then the creditor must prove actual intent to defraud. *Till v. Till*, 87 Ill.App.2d 358, 361, 231 N.E.2d 641, 643 (1st Dist.1967).

■■■ In the present case, the United States and Indiana National Bank have offered the following to demonstrate that Gamble's quit-claim conveyance of his Beechnut Drive home should be deemed fraudulent. First, Gamble has testified that the transfer was voluntary in all respects. The property was purchased one year before the transfer for $127,000, but was quit-claimed for a mere $10.00, a manifestly inadequate consideration. Under Illinois law, which this court is bound to follow, a transfer for grossly inadequate consideration is deemed to be a "voluntary gift." *Till*, 87 Ill.App.2d at 361; 231 N.E.2d at 643.

■■■ Second, at the time of the transfer, Gamble was in default on loans from the Indiana National Bank and knew of legal proceedings being brought against him to reduce that claim to judgment. Gamble was also aware no later than May 16, 1977 that the IRS was auditing him for his 1975 taxes. Although those taxes had not yet been assessed, the law is well settled, for fraudulent conveyance purposes, tax liabilities are due and owing on the date the returns are required to be filed and not the date of assessment. *United States v. St. Mary*, 334 F.Supp. 799, 803 (E.D.Pa.1971); *United States v. van der Horst*, 270 F.Supp. 365, 368 (D.Del.1967). *See also Zeddies v. United States*, 357 F.2d 897, 899 (7th Cir.1966) (holding that statutory liens under 26 U.S.C. § 6322 by contrast arise at time of assessment and that government was therefore relegated to its rights as a

creditor to avoid a preassessment conveyance). Therefore, the second element of constructive fraud—an existing or contemplated indebtedness—is also met.

Finally, Gamble has repeatedly testified that he is subject to a vow of poverty and owns no property of his own. Although Gamble's financial arrangements with the Church might in fact allow him to reach the funds necessary to pay his creditors, the Church's property is presently beyond his creditors' reach. *See Cairo Lumber Co. v. Landenberger,* 313 Ill.App. 1, 9, 39 N.E.2d 596, 600 (1942) (property concealed in the names of third parties is not readily available for creditor satisfaction and therefore not to be considered in determining amount of property retained by transferor). The court therefore agrees that Gamble has not retained sufficient assets to pay his indebtedness to them.

■ In his response, defendant Gamble has not presented any opposing affidavits to refute the above facts but instead has relied on unsupported factual obligations and bare legal conclusions to create a factual dispute. While this would ordinarily be insufficient to defeat a motion for summary judgment, the court notes that both Dr. Gamble and the Church, through its representative Reverend Paul Lindstrom, are appearing *pro se,* and should be held to a standard of pleading and argument less stringent than that applied to expertly trained members of the legal profession, *see Hughes v. Rowe,* 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–176, 66 L.Ed.2d 163 (1981). The court therefore entertains these arguments in full.

■ Gamble first contends that the Indiana National Bank fraudulently induced him to sign the promissory notes at issue and that the United States' tax assessment is invalid in law and was obtained only as a result of his inability to represent himself in those earlier proceedings. As the movants note, the bank's judgment on the promissory notes and the Tax Court's decision with respect to Gamble's 1975 tax liability are *res judicata* and cannot be relitigated in the present action. That reli-

gious convictions may have influenced Dr. Gamble not to contest those suits does not alter this conclusion. Dr. Gamble does not argue that allowing those earlier cases to proceed to judgment violated his first amendment rights, and, even if he did, the record shows that Dr. Gamble's decision was due to the Church's inability at that time to provide him with counsel of choice from within the Order, and his own busy schedule preventing him from representing himself. In this respect, Gamble's decisions not to defend the Bank suit and not to prosecute his Tax Court petition were as much due to personal convenience as to religious scruples. The court therefore finds no grounds for questioning the application of ordinary *res judicata* principles to the present case.

■ The court also finds that Gamble's arguments about the merits of the judgments against him does not affect the conclusion that there was an existing or contemplated indebtedness against the debtor. Under Illinois law, a party with a subsisting claim against a debtor at the time of the conveyance is a pre-existing creditor, even though his claim may not have matured or been reduced to judgment until after the conveyance was made. *See Tcherepnin,* 457 F.Supp. at 839; *Menconi v. Davidson,* 80 Ill.App.2d 1, 5, 225 N.E.2d 139, 142 (1st Dist.1967). That Gamble believed the Bank's suit to be without merit and believed that he owed no taxes is irrelevant to the existence of those debts. *Tcherepnin,* 457 F.Supp. at 839.

Defendant Gamble next argues that such property was never in reality owned by him, despite the use of his and his wife's names in the title, since the Church had financed both the downpayment and all subsequent payments. As the government argues, the bona fides of Gamble's financial arrangements with the Church must be seriously questioned, since these arrangements allow Gamble to claim tax exemptions and protection from creditors while enjoying full use of his income and property. Even assuming good faith in Gamble's relations with the Church, however, the

facts are uncontested that Gamble took title to his own name because the mortgagee Golf Mill Bank had refused to finance a purchase by the Church. The trust deed and all other legal documents relating to the realty were signed by the Gambles without any suggestion that they might have been acting as agents for the Church.

 In essence, Gamble's argument amounts to the contention that the 1977 quit-claim deed was a nullity intended merely to formalize his own understanding of what the relative property interests between himself and the Church had been all along. Gamble's understanding, however, is irrelevant. It has long been held in Illinois that a mortgagor who warrants title "will not be heard to say that at the time of the execution of the mortgage he had no title but that there was an outstanding title in a third person." *Kronan Building & Loan Ass'n v. Medeck*, 368 Ill. 118, 122, 13 N.E.2d 66, 68 (1938). Moreover, in his brief Gamble contends that the 1977 quit-claim deed was used to transfer the Beechnut property into the Church's name for the purpose of obtaining a tax exemption. Thus, Gamble himself has admitted that the property was "legally" his at the time of the transfer, his relations with the Church notwithstanding.

 Gamble finally argues that the transfer was supported by a valuable consideration—namely the Church's promise of continued support—and therefore cannot be avoided absent a showing of actual intent to defraud. The government has argued that such intent can be inferred from the circumstances of this case. The court does not reach the issue of intent, however, since a transfer of property for future services or support creates a trust for the transferor's benefit and is void against creditors. *People's Bank v. Wood*, 207 Ill. App. 602 (1917). Moreover, insofar as the Church had promised in 1974 to pay Gamble's mortgage payments and other living expenses, Gamble received absolutely no benefit from the contract that he did not have before. Thus, Gamble's argument that he received a valuable consideration must be rejected. The three elements of constructive fraud having been proven and not rebutted, the court finds that the conveyance may be set aside.

### Federal Tax Lien

 The conveyance having been ordered set aside, the court now addresses the question of relief. The United States has requested that its tax liens on the property be reduced to judgment and foreclosed and that the property be sold, with the proceeds to be distributed pursuant to the court's determination. The court finds that Gamble's previous default judgment in the Tax Court in *Gamble v. Commissioner*, No. 5289-78, (Tax Court Jan. 15, 1981), is *res judicata* in this action and that the government's assessment may therefore be reduced to judgment. *See United States v. Bottenfield*, 442 F.2d 1007, 1008 (3d Cir. 1971).

The court also concludes that the property should be sold. In *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), the Supreme Court held that Section 7403 of the Internal Revenue Code, 26 U.S.C. § 7403, empowers a federal district court to order the forced sale of a family home in which a delinquent taxpayer had an interest at the time he incurred his indebtedness, even though the taxpayer's spouse has an unencumbered separate "homestead" interest under state law in the same property. The Court noted that to the extent third-party property interests are "taken" in the process, § 7403 provides compensation by requiring the court to distribute the proceeds of the sale according to the interests of the respective parties. *Id.*, 103 S.Ct. at 2145. However, the Court also concluded that § 7403 does *not* require a "forced sale under all circumstances," but leaves "some limited room ... for the exercise of reasoned discretion." *Id.* at 2149.

In carving out an exception to the government's power of forced sale, the court emphasized that the discretionary power of the district courts to refuse authorization for a judicial sale should be

"exercised rigorously and sparingly, keeping in mind the Government's paramount interest in prompt and certain collection of delinquent taxes." *Id.* at 2152. The Court noted that it could think of "virtually no circumstances" in which a court should refuse to authorize a sale to protect the interests of the taxpayer himself instead of the interests of innocent third parties. *Id.* at 2151. And the Court noted that even where innocent third party interests are at stake, a "fairly limited set of considerations will almost always be paramount." *Id.* at 2151. The Court identified these considerations as follows: the extent to which the Government's interest would be prejudiced by a forced sale of the debtor's partial interest only; whether the third party with a non-liable separate interest in the property has a legally recognized expectation that the separate property would not be subject to forced sale by the delinquent taxpayer; the likely prejudice to the third party; and the relative character and value of the non-liable and liable interests held in the property. *Id.* at 2151–52.

█ Keeping in mind the Supreme Court's admonition in *Rodgers* that the above factors not be used as a mechanical checklist to the exclusion of common sense, the court applies these factors to the present case. The property is a residence jointly owned by Dr. and Mrs. Gamble. To sell *only* Dr. Gamble's interest would significantly prejudice the United States' financial interests in the property since few, if any, purchasers would pay half of the residence's fair market value simply to be a co-owner with Mrs. Gamble. Second, the court finds that Mrs. Gamble, having attempted to convey her interest in the property to the Church, cannot be said to have a solid expectation that her interest in the home was beyond foreclosure for another's debts. Although a forced sale would, of course, cause personal dislocation to Mrs. Gamble, the only way to avoid that dislocation would be to allow Dr. Gamble to continue in possession of his home without paying off his creditors first. Such a result would go against the equities in this case, and would wholly undermine the "Government's paramount interest in prompt and certain collection of delinquent taxes." *Rodgers*, 103 S.Ct. at 2152.

Accordingly, the court holds that the federal tax lien on the Beechnut property be foreclosed and the property sold, with the proceeds to be distributed according to the respective interests of the parties. The parties have not yet briefed the issue, but the court assumes that distribution would follow the priorities of 26 U.S.C. § 6323. That statute would give the United States' lien priority over that of the unperfected judgment creditor Indiana National Bank, but would subordinate the government's lien to Golf Mill State Bank, which held a perfected security interest prior to the time the government recorded its tax lien. It also appears that Mrs. Gamble may be entitled to a homestead estate in the Beechnut property under Ill.Rev.Stat., ch. 110, ¶ 12–901 (1981). If so, *Rodgers* clearly mandates that the taking of that estate through forced sale be compensated. The court will not enter a final order as to distribution, however, until such time as the parties have had an opportunity to be heard on the issue.

Therefore, the motion for summary judgment is granted. The conveyance is set aside, the government's tax lien is reduced to judgment, and the property is ordered sold to satisfy the claims of Gamble's creditors. The case is set for status on October 26, 1984, to discuss the priority of distribution.

It is so ordered.